IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COURTNEY COFFMAN** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **GRAND VIEW HEALTH FOUNDATION,** | : | |
| **LLC and GRAND VIEW HOSPITAL** | : | |
| d/b/a Grand View Health | : | **NO. 23-2073** |

## MEMORANDUM

**Savage, J.** April 9, 2024

Courtney Coffman brought this action for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and retaliation under the Civil Rights Act of 1866, 42 U.S.C. § 1981. She claims she was fired from her job as Chief Financial Officer of Grand View Hospital ("Grand View") because of her sex and for complaining about a comedian's racist and sexist jokes at a Board retreat.

Grand View moves for partial summary judgment. It challenges only the race-based retaliation claim. It does not seek judgment on the Title VII claims.

In considering a motion for summary judgment, we must view the facts in the light most favorable to the nonmovant, drawing all reasonable inferences in her favor. *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015) (citing *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n. 6 (3d Cir. 2007)). Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *In re Asbestos Prod. Liab. Litig. (No. VI),* 822 F.3d 125, 135 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

After reviewing the record and drawing all reasonable inferences in favor of Coffman, we conclude that a jury could disbelieve Grand View's proffered business reasons for terminating Coffman and find that it retaliated against her for complaining of a hostile work environment for women and minorities. Resolution of the disputed evidence depends on credibility determinations that only a jury can make. Therefore, we shall deny the motion for summary judgment.

Section 1981 employment discrimination claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009)). Because Coffman is proceeding under a pretext theory, we evaluate her claims applying the burden-shifting *McDonnell Douglas* analysis. *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under that framework, Coffman must first establish a *prima facie* case of retaliation for complaining about a racially hostile work environment. *Id.* If she establishes a *prima facie* case, the burden shifts to Grand View to "offer a legitimate, non-retaliatory reason" for its action. *Id.* (citing *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)). If it does, Coffman must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for retaliation. *Id.* (citing *Daniels*, 776 F.3d at 193). Coffman may show pretext by demonstrating that the employer's proffered reasons are "weak, implausible, contradictory, or incoherent." *Samuel Grossi & Sons, Inc.*, 49 F.4th at 347 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

To establish a *prima facie* case of retaliation under § 1981, Coffman must show that: (1) she engaged in protected activity; (2) Grand View took adverse action against her; and (3) there was a causal connection between the her protected activity and Grand View's adverse action. *See Samuel Grossi & Sons*, 49 F.4th at 346.

Grand View argues that Coffman has failed to establish a *prima facia* retaliation claim. It contends that complaining about "a single performance by an outside comedian" does not constitute protected activity under 42 U.S.C. § 1981.[1] We disagree.

Section 1981 protects racial minorities from discrimination in the workplace. *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010) (citation omitted). It also protects "an individual (black or white) who suffers retaliation because [s]he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights." *Id.* at 798 (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452 (2008)).

To establish a *prima facie* retaliation case, Coffman need not demonstrate that the work environment was actually hostile. *Kengerski v. Harper*, 6 F. 4th 531, 537 (3d Cir. 2021). She need "only [show] that [s]he held an objectively reasonable belief that it was." *Id.* A complaint about "minor and isolated" workplace behavior that could not "remotely be considered extremely serious" is not protected activity. *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). Nonetheless, depending on its severity, an isolated, "single incident can amount to unlawful activity." *Castleberry*, 863 F.3d at 267.

At the direction of Board Chair Rob Pritchard, Doug Hughes, the CEO, hired the comedian for the retreat.[2] Executive management, senior team leaders, board members,

---

[1] Defs.' Br. in Supp. of Partial Mot. For Summ. J. at 11 ["Defs.' Br."], ECF No. 23.

[2] Pritchard Dep. 132:15-133-11, ECF No. 25-21 (attached as Ex. U to Pl.'s Mem. of L. in Opp'n to Def.'s Mot. For Summ. J., ECF No. 24 ["Pl.'s Resp."]); Hughes Dep. 124:12-18, ECF No. 25-2 (attached as

medical staff, and spouses, some of whom were Black, attended the retreat.[3] Before the retreat, Coffman had expressed concern that the comedian's usual content was inappropriate.[4] Jan Rossi, Vice President of HR, who was familiar with the comedian's routine, warned Hughes to ensure that the comedian adapts his routine for the workplace.[5] According to Rossi, Hughes brushed off her concern and hired the comedian because Pritchard wanted him.[6] Before the performance, Pritchard warned the comedian to "keep it clean."[7]

At the retreat, the comedian impersonated Black people and recited racial stereotypes, racist tropes, and caricatures of African Americans.[8] Cynthia Westphal, Chief of Nursing, testified that he made a "racially charged innuendo" that Allen Iverson, a Black professional basketball player, was "hanging out with convicted felons."[9] Coffman recalled that the Iverson impersonation included jokes that his "buddies from the hood" were hanging onto him and draining his money.[10] The impersonations, in Coffman's view, made Iverson seem "less educated."[11] The comedian impersonated Iverson's mother

---

Ex. B to Pl.'s Resp.).

[3] Defs.' Stmt. of Undisputed Material Facts ¶ 57, ECF No. 23 ["DSF"]; Pl.'s Resp. to Defs.' Stmt. of Undisputed Material Facts in Supp. of Defs.' Partial Mot. for Summ. J. ¶ 57, ECF No. 24 ["PRDSF"]; Rossi Dep. 160:23-161:2, ECF No. 25-6 (attached at Ex. F to Pl.'s Resp.); Hughes Dep. 210:5-9.

[4] DSF ¶ 55, PRDSF ¶ 55.

[5] Rossi Dep. 155:1-13.

[6] Id. 154:22-24.

[7] Pritchard Dep. 139:1-3; DSF ¶ 58, PRDSF ¶ 58.

[8] Coffman Dep. 142:2-18, 280:22-281:7, ECF No. 25-5 (attached as Ex. E to Pl.'s Resp.); Rossi Dep. 156:22-157:9; Westphal Dep. 9:3-15, ECF No. 25-11 (attached as Ex. K to Pl.'s Resp.).

[9] Westphal Dep. 9:13-15.

[10] Coffman. Dep. 142:5-10.

[11] Id. 280:16-17.

and, according to Coffman, portrayed her as a caricature of an angry Black woman.[12] Coffman recounted that he also performed impersonations of prostitutes in Kensington, joking that because they were ugly, their services were worth less.[13] The jokes "degraded females, and a large portion of the audience was female."[14] Coffman found it "incredibly offensive" and "insulting."[15]

The following week, Coffman complained to Hughes that the performance was "racist" and "created a hostile environment for females and minorities."[16] Coffman was not the only one. Westphal also complained that she "was really uncomfortable with the racist overtones of his Allen Iverson jokes."[17] Hughes responded, "thanks for the feedback."[18] To Westphal, Hughes "appeared to be uncomfortable" and "angry."[19] Coffman recommended that Grand View issue a letter expressing that the presentation did not reflect the values of the organization.[20] Westphal testified that Hughes "didn't feel like that was necessary."[21]

When Hughes was asked in his deposition if he agreed that the performance was inappropriate, he responded, "No, I don't agree with that. I mean at the end of the day, [the comedian] didn't present anything at the board [retreat], I should say, that was not

---

[12] *Id.* 142:11-18; Pl.'s Stmt. of Additional Material Facts ¶ 31, ECF No. 24 ["PSF"].

[13] Coffman Dep. 140:12-23.

[14] *Id.* 279:8-10.

[15] *Id.* 138:13-18, 139:3-4.

[16] DSF ¶ 67, PRDSF ¶ 67.

[17] Westphal Dep. 9:5-7.

[18] Coffman Dep. 144:22-23.

[19] Westphal Dep. 10:21-23, 11:11-15.

[20] Coffman Dep. 144:13-19.

[21] Westphal Dep. 11:1-4.

something I had heard on the radio."[22] He added, "I addressed the concerns. We didn't have [the comedian] back and we moved on."[23] However, he also testified, that under the new Board Chair, Grand View decided not to have any "extra events" at its board retreats.[24] Pritchard testified that privately Hughes was "frustrated" that the presentation "was causing problems" and "got [him] in trouble with staff."[25] This admission shows that others found the comedian's routine offensive.

Coffman has produced evidence from which a reasonable jury could believe that Grand View's Board Chair and its CEO, ignoring complaints about the racially charged comedy routine, tacitly condoned it. The facts construed in the light most favorable to her show that Coffman acted under a good faith, reasonable belief that she was complaining of a racially hostile work environment. The jokes caricaturing Black people could reasonably be viewed as ridicule or insult based on race. A person in Coffman's shoes could have reasonably believed that the comedian's routine was racist and sexist. Indeed, Westphal, and apparently others, shared Coffman's concerns that the comedian's impersonations had "racist overtones," which made her uncomfortable on behalf of the audience members.[26] Contrary to Grand View's contention, Coffman has produced evidence that she made a good faith complaint of a racially and sexually hostile work environment constituting protected activity.

---

[22] Hughes Dep. 133:11-17.

[23] *Id.* 134:9-11.

[24] *Id.* 122:22-24.

[25] Pritchard Dep. 134:3-4, 135:23-136:2.

[26] Westphal. Dep. 9:5-7.

Having shown that she was terminated after making a complaint of a racially and sexually hostile work environment, Coffman has established a *prima facie* retaliation claim under § 1981.

Grand View argues that it did not terminate Coffman for making the complaint, but for her "unprofessional and insubordinate behavior."[27] Grand View cites a document entitled the "Coffman Summary" that it claims Hughes "had updated throughout his tenure as interim CEO."[28] In it, he outlined his "interpersonal and business issues" with Coffman.[29] Grand View asserts that Hughes suspended and ultimately terminated Coffman because of these issues and after she yelled "Who is in charge here?" in a January 21, 2022, meeting.[30] Following the meeting, Hughes called the Vice President of HR, Jan Rossi, and summarized his reasons for suspending her. He cited Coffman's "inappropriate" interactions with him, her delay in calling the Finance Committee Chair as he instructed, and her working from home when she should have been in the hospital.[31]

There are disputed facts that bear on the reason Hughes terminated Coffman. First, Coffman denies that she yelled at Hughes and there is no contemporaneous documentation that she did.[32] His notes from the meeting state they "[h]ad a general back

---

[27] Defs.' Br. at 1.

[28] DSF ¶ 122.

[29] *Id.*

[30] *Id.* ¶ 100.

[31] Rossi Dep. 37:2-10, 50:12-13, 50:22-24, 51:1-4, 56:21-22.

[32] DSF ¶ 100, PRDSF ¶ 100.

and forth" and a "discussion."[33] He later told Rossi that Coffman was "loud and animate, not yelling."[34] But, Hughes's secretary "heard her yell at [him]."[35]

Second, Coffman disputes that Hughes suspended her for her purported failure to call the finance chair about the hospital's poor financial results. She points to testimony from the finance chair, Blair Rush, who disagreed that her failure to call him was a reason to suspend her. Rush testified, "I did express a concern that Courtney's performance from my perspective as chair of the financial committee and a nonmember of the managing team and somebody that's in the hospital every day, …would not warrant a suspension."[36]

Third, Coffman argues that Hughes's justification that she worked from home too frequently is based on disputed and incomplete evidence.[37] Grand View has produced Coffman's badge swipe data into the Main Hospital to prove that she often worked from home. Coffman notes that the badge swipe data does not include her entries into the Silk Mill building where her direct reports were located.[38] She contends it does not capture the real number of days she worked on site.

Fourth, Coffman has produced evidence that contradicts Hughes's *post hoc* documentation of her workplace issues. There is evidence that Hughes did not—as he claimed—maintain the Coffman Summary "throughout his tenure," but created it after Coffman complained about a racially hostile work environment. The Coffman Summary is inconsistent with a 2020 Performance Review from the outgoing CEO, who described

---

[33] Coffman Summary, ECF No. 23-2 (attached as Ex. 16 to Defs.' Br.).

[34] Rossi Dep. 86:6-8.

[35] Bishop-Jayes Dep. 53:21, ECF No. 23-2 (attached as Ex. 12. to Defs.' Br.).

[36] Rush Dep. 50:7-13, ECF No. 25-17 (attached as Ex. Q to Pl.'s Resp.).

[37] PRDSF ¶ 42.

[38] *Id.*

Coffman as having "formed a cohesive team" that was "engaged, enthusiastic and happy."[39] Grand View "pulled off" a "remarkable successful bond sale," because of "her leadership, her style, her talent and her hard work."[40] Rush also testified, "Courtney did excellent work in handling [the bond dealing] for us as the CFO…and I think others agreed with me about that."[41] With respect to her firing, he testified, "I believe everyone exhibited some reservation about that termination."[42] In Rossi's opinion, "there was not a wrongdoing that was a terminable offense."[43]

To succeed on her retaliation claim under § 1981, Coffman must demonstrate that a reasonable jury could find that she would not have been fired by Grand View "but for" her complaints of a hostile work environment based on race. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Coffman complained that the comedian's presentation created a hostile work environment for minorities and females. She specified that his jokes relied on offensive and racist tropes. For the reasons explained, she has also presented evidence that she was retaliated against for complaining. Whether she was fired for complaining of a hostile work environment based on race and sex is a fact question for the jury to decide.

Grand View argues that Coffman's suspension on January 21, 2022, two months after making her November 18, 2021, complaint, is too long to suggest retaliation.[44] Coffman cites a shorter timeline—seven weeks. She points to evidence that Pritchard and

---

[39] Courtney Coffman 2020 Performance Review, ECF No. 25-18 (attached as Ex. R to Pl.'s Resp.).
[40] *Id.*
[41] Rush Dep. 82:11-21.
[42] *Id.* 77:15-17.
[43] Rossi Dep. 50:10-11.
[44] Defs.' Br. at 14.

Hughes planned to fire her on January 7, 2022. That day, Pritchard sent an email to the Board requesting authorization for Hughes to "make senior management changes" because Coffman "ha[d] resisted… accountability."[45] Two days later, Hughes emailed a friend stating, "Big night tomorrow. Board Chair wants me to convince the Board to fire the CFO."[46] On January 9, 2022, Hughes created the "Coffman Summary" document listing "discussions" he had with her since he assumed the role of interim CEO.[47] Hughes revised the document on January 21, 2022, and emailed it to Rossi to justify Coffman's suspension.[48]

It does not matter whether it was seven weeks or eight weeks. The temporal proximity between the time Coffman made the complaint and when Pritchard and Hughes planned her termination was less than two months. Two months does not preclude a finding of a causal connection between her complaint and termination. *See Fasold v. Justice*, 409 F.3d 178, 189-90 (3rd Cir. 2005) (reversing district court grant of summary judgment because court failed to consider inference created by adverse action within less than three months following engagement in protected activity); *Beishl v. Cty. of Bucks*, No. 18-2835, 2018 WL 6812132, at *7 (E.D. Pa. Dec. 27, 2018) (three months between protected activity and termination); *Mercer v. Dietz & Watson, Inc.*, No. 15-3928, 2015 WL 7294901, at *4 (E.D. Pa. Nov. 19, 2015) (two months between protected activity and termination).

---

[45] Pritchard's January 7 Email, ECF No. 25-22 (attached as Ex. V to Pl.'s Resp.).

[46] Hughes's Email to Stein, ECF No. 25-25 (attached as Ex. Y to Pl.'s Resp.).

[47] January 9 Coffman Summary, ECF No. 25-15 (attached as Ex. O to Pl.'s Resp.); Metadata for January 9 Coffman Summary, ECF No. 25-16 (attached as Ex. P to Pl.'s Resp.).

[48] Coffman Summary, ECF No. 23-2 (attached as Ex. 16 to Defs.' Br.).

We conclude that a reasonable jury could reject the proffered explanation that Coffman was terminated for a legitimate business reason. A factfinder could disbelieve Hughes's justification for her termination and find that it was retaliation for her complaint of a hostile work environment for minorities and women. The reason Coffman was fired requires credibility determinations that can only be resolved by a jury. Therefore, we shall deny Grand View's motion for partial summary judgment.